No. · 2376

Second Circuit Appeal

## FRED D. MALICORD v. UNITED STATES SHEET AND WINDOW GLASS COMPANY

(June 23, 1925, Opinion and Decree)
(———, Rehearing Refused)

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Master and Servant—Par. 160 (I); Appeal—Par. 625.**
   The finding of the trial judge in a Workmen's Compensation case under Act No. 20 of 1914, as amended by Act 216 of 1924, that the injured employee was partially disabled to do work of any· reasonable character being clearly cor-. rect, is affirmed.

Appeal from First Judicial District Court of Louisiana, Parish of Caddo, Hon. J. H. Stephens, Judge.

Judgment affirmed.

Julius T. Long, of Shreveport, attorney for plaintiff, appellee.

Wilkinson, Lewis & Wilkinson, of Shreveport, attorneys for defendant, appellant.

REYNOLDS, J. Plaintiff sues defendant under the Workmen's Compensation Act for $18 per week during his disability, not exceeding 400 weeks.

The defense is· that defendant has paid plaintiff all the compensation he is entitled to.

The District Judge allowed plaintiff compensation at the rate of $18 a week during disability, not exceeding 300 weeks, beginning July 26, 1923, less a credit of $828 to be satisfied out of the first forty-six payments due, with legal interest on each weekly payment from its maturity until paid. ·

· The fees of the attorney representing the plaintiff were fixed at one-fourth of the net amount recovered under the judgment.

Defendant appeals.

## OPINION

Apparently the District Judge's judgment is based upon Subsection (c) of Section 8 of the Workmen's Compensation Act as amended.

Defendant contends that plaintiff's compensation should be settled under Paragraph (e) in proportion to the schedule set out in Paragraph (d) of Section 8.

Defendant claims, and established by Doctor G. A. Caldwell, that plaintiff's injuries could be reduced to the loss of his forearm if he would submit to the amputation of his forearm; but this has not taken place, and whether it shall or not is ·a matter entirely at the option of the plaintiff. This court cannot compel him to· submit to the amputation even if it were of the opinion that it would be highly advantageous to him to do so; and the court must decide the case under the conditions that are shown to have existed at the time of the trial.

Plaintiff suffered a severe .cut on the right arm by a heavy piece of glass falling on his wrist, cutting four ligaments and causing an inhibition in the use of the fingers of the hand and causing him, he says, continuous pain.

At the time of the injury plaintiff was 47 years old and had never done any kind of work except that of a glass cutter, a barber and a musician, and claims to have been totally disabled by his injuries from following any of these occupations.

On this point he testified, page 4:

"Q. Well, tell the court so it can know what you can do, how much do you lack closing your hand?
"A. An inch or an inch and a half; the first finger I can do better but I can't hardly use the others. · ·
"Q. You can do better with that index finger than with the other three?
"A. Yes, sir.

"Q. The other three you can close considerably closer?

"A. Yes, sir; always pain, though.

"Q. Where does it pain you?

"A. Right here. (Witness indicating.)

(Page 5)

"Q. Well, it pains you from something like about half-way to your elbow to the tip of your finger?

"A. Yes, sir.

* * * *

"Q. What kind of pain do you have?

"A. Just hurt all the way—I can't describe—I am only one knows. I can't tell what I have, because you wouldn't believe if I tell you.

* * * *

"Q. Does it feel cold?

"A. Oh, yes, yes, cold; oh, yes, got to keep it under my arm, this way. (Witness demonstrating.)

(Page 6)

"Q. Is that all the time or is it just at intervals?

"A. Well, most all the time, most all the time, yes.

"Q. Can you follow either one of the occupations or jobs you used to follow, now?

"A. No, sir, I can't follow.

(Page 8)

"Q. What kind of hard labor can you do now?

"A. I don't know; I can't do nothing at all.

"Q. Have you got any trade at hard labor at all that you can follow now?

"A. No, you have to have two good hands. I tried to go back to the factory and couldn't do it.

(Page 11)

"Q. What have you been doing since you received this injury?

"A. Been living on my children.

* * * *

"Q. You have done no work at all?

"A. No, sir.

(Page 12)

"Q. Mr. Malicord, don't you think it would be possible for you to do some kind of work; can't you do some kind of a job?

"A. It is a question. I tell them in New Orleans if you give me job I try it, but they don't need man with only one

hand. I tell them I was willing to work, and you ask same question. I am willing to work if you give me job. I try.

(Page 16)

"Q. Mr. Malicord, this petition which you have filed states you will never be able to do work of any reasonable character. Don't you think that you could do work in a store, for instance, selling merchandise?

"A. Well, I don't know. Last week I tried to hammer a nail on board and hammer slip out of my hand and hit finger. I couldn't do it. I always tried to do something with my hand. My name is work; always work for a living, and I am willing to work yet if anybody give me job. I can't get job, nobody want one-handed man.

"Q. You don't propose to sit back and do nothing all the rest of your life, do you?

"A. Sure not.

"Q. You expect to go to work?

"A. When I am able to work, yes, sir.

"Q. Don't you think you will be able to do work of some kind?

"A. Well, they ask me that same thing in New Orleans and I tell them: 'Give me job.' I would try it, but you have got to have two hands to get job, they don't want cripple man, they want man with good arms, hands and good legs.

(Page 19)

"Q. You know how glass is shipped and labeled and how it is sold?

"A. Well, I don't know, but I am like a monkey, if you show me the trick I might be able to do it.

"Q. Here is the proposition, Mr. Malicord: I am not trying to trip you up, but you appear to be an intelligent man and your arm doesn't appear to be injured much from just looking at it; you have a nice, neat-looking appearance, and appear to be quite an intelligent man. I ask you, don't you think you can find some kind of reasonable work which you could do?

"A. I tell you now I never was a man that refused to work. I always worked all my life. I try to take care of myself and my family and until I got hurt I work all time I had work and try to keep busy all the time, but I tell you my hand gets cold and hurts me so bad sometimes I have to cry to myself. No use to joke with me

about it, that never go with me. You give me chance, I try."

Doctor G. A. Caldwell testified, page 21:

"Q. Doctor Caldwell, have you had occasion to examine the arm and wrist of the plaintiff, Fred D. Malicord, and if so where and when, and please state your finding?

"A. I examined him at my office weeks ago—the date is on the report—I forget the exact date; but the findings were, briefly, that he gives a history of a cut on the right wrist slightly above the joint by a heavy piece of glass. An examination shows the scar where this cut was directly across the wrist, together with another long scar running up the inside of the forearm, starting from the wrist and running about a third up the arm; both of these are pretty well healed and seem to be in good condition at the present time. The function of the wrist and hand, however, seem to be considerably impaired. The movement of the wrist joint itself is very good, but the movements of the fingers in bending down into the palm are considerably impaired and limited, the power to flex not being great enough to permit him to close one more than that much, that is, the tips of the fingers not coming within an inch or three-quarters of an inch of the palm. That makes it impossible for him to grip a small object, or grip anything sufficiently tight to hold it securely. He cannot grip a small object at all in that condition. In addition to that there is a certain amount of perspiration which is on one side; it perspires almost constantly on one side of the hand, more than on the other side, and the fingers on that side of the hand have some disturbance of sensation in them, as you try it out with pin pricks and other tests. You see, they are diminished particularly at the ends of the fingers. The joints of the fingers in that area are somewhat thickened and enlarged. These things I have stated, I think, namely, the enlargement of the joints, the diminished sensation and the perspiring on that side of the hand, are indicative, as a rule, of nerve injury. Perhaps I shouldn't say injury, but involvement of the nerves supplying these parts in some part of their course. In this case, considering all these symptoms were below the scar of the original cut, I presume that the nerve was impounded upon, or pressed upon at the point of the cut. It doesn't necessarily

follow that the nerve was divided or cut into. I think that the cause of the disability in the hand is the cut. There were, unquestionably, according to the history and subsequent operative reports, some of the tendons cut, and some of these have united and some don't seem to have completely united, and, in addition, there is perhaps an involvement of the medial and perhaps the long nerve, also to such an extent as to cause inhibition in the use of the fingers, and most probably would account for the pain that he complains of. He complains of constant pain, which is reasonable under these circumstances.

(Page 24)

"Q. As to the general appearance of the plaintiff, he is rather an intelligent looking man, is he not?

"A. Quite.

"Q. Apparently straightforward?

"A. Yes, quite.

(Page 25)

"Q. Doctor, is there any reason why a man in the condition of this plaintiff should sit up and do nothing for the rest of his life?

"A. The only reason—and that can't be determined correctly—is the factor of pain. If a part is hurting constantly it renders him incapable of using that part, and if the pain were quite severe it naturally would interfere with his work.

"Q. Doctor, couldn't that pain be stopped by amputating that arm at the elbow?

"A. Yes.

(Page 26)

"Q. Well, reasonably light work?

"A. He could probably use it gripping down as far as it went, for a while, but if he has the pain he complains of and his hand got cold, he would have to quit.

(Page 27)

"Q. Doctor, I will ask you from your examination of this plaintiff if there aren't numerous kinds of work he could do, for instance, in a dry goods store, handling light boxes—you are familiar with the man who sells you socks and ties and things like that—is there any reasonable work—is there any reason why this man couldn't do that work?

"A. I believe he does have enough pain —he could work at it probably a short time —but after that perhaps—he could hand down boxes once or twice or perhaps three or four times, but the factor of pain would soon enter into it and stop him from using

it any more. What he could do with the other hand naturally would not be affected further than the use of both of them.

"Q. He says that hand gives him pain when he is not working?

"A. It very probably does, yes.

"Q. Are you prepared to testify whether he has any pain when he is not using the arm?

"A. No, I can't say whether he feels pain or not except by comparing it with other cases and by the involuntary things that he does which indicate that he has real pain and discomfort.

"Q. The pain about which you are testifying—your testimony is based entirely on what he told you, is it not?

"A. Entirely on what he told me, together with the way he protects the hand involuntarily or subconsciously, you might say, the way he protects it when he is not being noticed or doesn't know that he is."

There is no contradictory evidence of this testimony; and from all of the evidence we are convinced that the injury suffered by plaintiff produced partial disability to do work of a reasonable character, and therefore that the finding of the District Judge was correct.

ON APPLICATION FOR REHEARING

CARVER, J. In the brief of defendant's counsel on application for rehearing, they say:

"We think that in view of the facts which have been shown above that if the plaintiff is entitled to recover his recovery should be based on subsection (c) of section 8 of the act of 1922 which covers an injury producing partial disability and fixes recovery at 60% of the difference between the wages at the time of injury and wages which the injured employee is able to earn thereafter during the period of disability, not exceeding 300 weeks."

This is the subsection applied in our decision, which was based on a reduction in plaintiff's earning capacity of at least $30.00 a week; the $18.00 a week allowed being 60% of $30.00.

The evidence satisfied us that the reduction in earning capacity was more than this. Plaintiff says that at the time of the accident he was earning ten or twelve dollars a day and for six or seven years had never made less than $10.00 a day.

The accident wholly unfited him to follow either of the sole occupations he had ever followed and though he was able to do some kind of remunerative work we are satisfied from the evidence that he cannot earn as much as $30.00 a week, which will be a reduction of at least $30.00.

Rehearing refused.